RENDERED:  DECEMBER 10, 2021; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2021-CA-0056-MR

ROBERT S. CLARK                                             APPELLANT

APPEAL FROM FAYETTE CIRCUIT COURT
v.          HONORABLE KIMBERLY N. BUNNELL, JUDGE
ACTION NO. 20-CR-00146

COMMONWEALTH OF KENTUCKY                                    APPELLEE

OPINION
AFFIRMING

** ** ** ** **

BEFORE:  COMBS, DIXON, AND MAZE, JUDGES.

COMBS, JUDGE:  This is a criminal case in which the Appellant, Robert S. Clark

(Clark), appeals from the denial of his motion to suppress by the trial court.  After

our review, we affirm.

On February 10, 2020, the Fayette County Grand Jury indicted Clark

for one count of receiving stolen property (firearm) and one count of possession of

marijuana. Prior to his trial, Clark filed a motion to suppress on September 10, 2020.

The trial court conducted a suppression hearing on September 21, 2020. The Commonwealth called Detective Paul Hogan of the Lexington Police Department. The defense did not call any witnesses. Detective Hogan testified that on November 13, 2019, he was working as a patrol and field training officer. He saw a vehicle -- a blue Chrysler Pacifica -- which had stopped at a gas station on Augusta Drive. Detective Hogan had previously received information about "complaints" or reports of drug trafficking from that vehicle, including a description and plate registration that matched.[1] The trial court asked:

> **The court:** So you see this vehicle?
> **Det. Hogan:** Yes, Your Honor.
> **The court:** So why didn't you stop it?
> **Det. Hogan:** We didn't stop it ma'am, they stopped at the gas pump.
> **The court:** Gotcha, so they're actually at the pump stopped getting gas.
> **Det. Hogan:** They were not actually getting gas at the time.
> **The court:** Ok.
> **Det. Hogan:** They were just stopped at the pump and we were in the same parking lot that they were in.

[1] Detective Hogan explained that on November 4, 2019, the manager of an apartment complex located across from the gas station had seen the vehicle in a hand-to-hand transaction in an area where drug trafficking was known to have occurred. At the time, Officer Freeman investigated and had contact with the man in that vehicle. Officer Freeman advised Detective Hogan that he had seized a gun from the vehicle and that there was marijuana in it. Detective Hogan did not know if there were any arrests.

**The court:** So then you just approached them?
**Det. Hogan:** Correct.

Detective Hogan's continuing testimony established that he had first noticed the vehicle driving in the opposite direction on Aniston Drive heading toward Augusta Drive. Detective Hogan and Officer Edge were riding together, and they turned around. The vehicle pulled into a gas station and the officers pulled into the parking lot. Body camera footage showed that Clark, the driver, came from inside the store and got back in the vehicle before the officers approached it.

Detective Hogan testified that he approached the vehicle on the passenger side while Officer Edge approached the driver's side. Detective Hogan did not know if the window on the driver's side was down or not. Detective Hogan gestured at the passenger in a wave-like motion. When he saw that Officer Edge had made contact with the operator of the vehicle, Detective Hogan knocked on the window and waved again. The passenger rolled the window down. Detective Hogan testified that he did not turn on his lights or siren when he approached the vehicle; he did not block the vehicle with the cruiser; he did not stand in front of the vehicle; he did not tell the occupants not to drive off. Detective Hogan testified that he considered the nature of the encounter consensual and that they were getting out to follow-up on the prior complaints they had received.

After the passenger rolled down the window, Detective Hogan advised him they had received complaints of criminal activity involving the vehicle. Detective Hogan testified that he detected the odor of marijuana emanating from the vehicle as soon as the passenger rolled down the window. When Detective Hogan told the occupants that he smelled marijuana, they said they did not have any in the car but that they had already smoked it. Detective Hogan then asked them to get out of the car. Detective Hogan's body camera video confirms that after he told the occupants that he smelled marijuana, the passenger admitted they had smoked it earlier. Detective Hogan then stated, "We're going to search it just to make sure, so we'll have you guys hop out real quick."

There were five young men in the car -- three teenage juveniles and two 18 years of age, one of whom was Clark, the Appellant now before us. After they exited the car, the occupants stood outside in front of the cruiser. A third officer arrived. Detective Hogan testified that once he began searching the vehicle, he located two firearms in the glove box as well as marijuana residue throughout the car. He then ran the serial numbers on the firearms through a database, and one came back reported as having been stolen in Scott County. They placed Clark under arrest; it was his vehicle, and the stolen gun was in his glove box.

Following oral argument, the trial court denied the motion to suppress. The trial court found that the cruiser's pulling in behind the vehicle was not a seizure -- that the vehicle could have pulled forward and kept going. The trial court found no show of force, noting that the police are allowed to have a consensual encounter. The court found that there were two officers in one car, noting that two is "probably not a lot"; that the vehicle was not blocked in; that the officers did not have their hands on their guns and did not have their guns at the ready position; and that the officers were not yelling and screaming when they asked the occupants to exit the car. The court concluded:

> I still don't believe there's a stop. I still believe we get with the approach to the vehicle and I don't believe there was a show of force, the only difference being is that the police are a presence of authority, and just their mere presence is not a show of force that equates to being seized. And I think knocking on the window, it's the same thing as knocking on the door. Did they have the right not to roll down the window? They did. Now you know, do most reasonable people think they can't, I don't know the answer to that, I mean I guess we could poll but just because everybody doesn't understand the law, that doesn't mean that's not what the law is. And so I think the officers acted appropriately. . . .

On September 23, 2020, the trial court entered an order denying the motion to suppress.

Clark subsequently entered a conditional plea preserving his right to appeal the denial of his motion to suppress. He was convicted of receiving a stolen

firearm and possession of marijuana and was sentenced to one year, probated for two years.

In his appeal, Clark contends that the trial court erred in denying his motion to suppress because he was "clearly seized absent reasonable suspicion" when the officers pulled behind his vehicle, approached both sides, and "demanded" that he roll down the window.

We are governed by a dual standard of review in considering a trial court's denial of a motion to suppress. We must first determine if there is substantial evidence for the court's findings; if so, they are conclusive. We then review its application of the law to the facts *de novo*. *Lydon v. Commonwealth*, 490 S.W.3d 699, 701 (Ky. App. 2016).

Unreasonable searches and seizures are forbidden both by the Fourth Amendment of the United States Constitution and by Section 10 of the Constitution of Kentucky. In analyzing the nature of a seizure, we note the following reasoning:

> There are three types of interaction between police and citizens: consensual encounters, temporary detentions generally referred to as *Terry* stops, and arrests. The protection against search and seizure provided by the Fourth Amendment to the United States Constitution applies only to the latter two types. Generally, under the Fourth Amendment, an official seizure of a person must be supported by probable cause, even if no formal arrest of the person is made. However, there are various narrow exceptions based on the extent and type of

intrusion of personal liberty and the government interest involved. In the seminal case of *Terry v. Ohio*, [392 U.S.1, 88 S. Ct. 1868, 70 L. Ed. 2d 889 (1968)] the Supreme Court held that a brief investigative stop, detention and frisk for weapons short of a traditional arrest based on reasonable suspicion does not violate the Fourth Amendment. *Terry* recognized that as an initial matter, there must be a "seizure" before the protections of the Fourth Amendment requiring the lesser standard of reasonable suspicion are triggered. A police officer may approach a person, identify himself as a police officer and ask a few questions without implicating the Fourth Amendment.

*Baltimore v. Commonwealth*, 119 S.W.3d 532, 537 (Ky. App. 2003) (footnotes

omitted). *Lydon*, 490 S.W.3d at 702.

[A] person has been "seized" within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.

*United States v. Mendenhall*, 446 U.S. 544, 554, 100 S. Ct. 1870, 1877, 64 L. Ed.

2d 497 (1980) (footnote omitted).

In the case before us, the trial court's findings included the facts: that

the vehicle was not blocked in, that there were only two officers, that the officers

did not display their weapons, and that they did not yell and scream at the

occupants. These findings are supported by substantial evidence; therefore, they are conclusive. We must next determine if the trial court correctly applied the law to those facts.

In *Commonwealth v. Garrett*, 585 S.W.3d 780 (Ky. App. 2019), an officer saw a vehicle parked at night in what he believed was a high crime area. He approached the driver's side of the vehicle on foot and his partner approached the passenger side. The officer spoke with the driver, Garrett, and asked for identification. Garrett handed the officer his driver's license. The officer returned to his cruiser and ran the license through dispatch. He detained Garrett until dispatch could confirm a possible warrant. In the meantime, Garrett's passenger, Hendrix, started moving erratically as if she were concealing something. She was removed from the vehicle, and the officers conducted a search that yielded contraband. At approximately the same time as the search, dispatch confirmed that there was no warrant for Garrett.

Although this Court concluded that Garrett was seized for Fourth Amendment purposes when the officer took Garrett's license back to his cruiser, the initial contact began as a lawful consensual encounter. We find the analysis of that encounter both helpful and pertinent:

> The first step in determining whether there has been a Fourth Amendment violation, is finding whether and when a seizure or a search occurred. Both occurred here, **but the initial contact in this case was neither**.

Unlike most police interaction with occupants of vehicles, **this incident did not begin as a traffic stop**. In other words, the officers did not pull Garrett over for violating a traffic law . . . . There was no police-observed infraction of the law. Officer Smith simply approached Garrett . . . "to see what his activities were." And there is nothing wrong with that.

"**Police officers are free to approach anyone in public areas for any reason**[.]" *Strange v. Commonwealth*, 269 S.W.3d 847, 850 (Ky. 2008) (quoting *Commonwealth v. Banks*, 68 S.W.3d 347, 350 (Ky. 2001)). "**No '*Terry*' stop occurs when police officers engage a person** . . . **in conversation by asking questions**." *Id*. at 850 (citing *Florida v. Royer*, 460 U.S. 491, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983)). **In Fourth Amendment jurisprudence, such conduct is characterized as a "consensual encounter" and is not itself a search or a seizure**. *United States v. Campbell*, 486 F.3d 949, 954 (6th Cir. 2007).

. . . .

The officers' approach was not threatening. They did not use their vehicle to block Garrett from driving away and he would have been free to do so. There is not even testimony that Officer Smith used flashing lights or a siren. So, the encounter Officer Smith initiated was consensual and no seizure had occurred.

. . . .

**Nothing changed when the officers approached Garrett and Hendrix on their respective sides of the vehicle. "[A]pproaching the vehicle in this manner [with one officer on each side of the car], by itself, does not make the encounter nonconsensual**." *United States v. Pettis*, 591 F. App'x 393, 396 (6th Cir. 2014) (brackets in original) (quoting *United States v. Carr*, 674

-9-

> F.3d 570, 573 (6th Cir. 2012)) (citing *United States v. Dingess*, 411 F. App'x 853, 854 (6th Cir. 2011)).
>
> . . . .
>
> Officer Smith's polite tone and request for identification would not have caused a reasonable person to suspect he was not free to leave the scene. And Garrett's consent to allow Officer Smith to examine his license, in and of itself, changed nothing. Similarly, Officer Smith's brief possession of Garrett's license, long enough to identify him, changed nothing. It was merely a part of the "inoffensive contact" between them. Until this point, Garrett had no objectively reasonable basis for believing he was not free to leave.

*Garrett*, 585 S.W.3d at 790-92 (bold-face emphases added).

In the case before us, the officers had the right to approach the stopped vehicle and to engage the occupants in conversation. The officers' approach was not threatening -- they did not block the vehicle from leaving the gas station, nor did they use lights or a siren as they approached. Nothing changed when Detective Hogan and Officer Edge approached the occupants on their respective sides of the vehicle. The officers' tone was polite and not demanding or threatening. There was no yelling or screaming.

We conclude that the trial court correctly applied the law to the facts in concluding that there was no stop and no seizure. As soon as Detective Hogan smelled the marijuana emanating from the car, he immediately had probable cause

to search the vehicle and its contents under the plain-smell exception to the warrant requirement. *Greer v. Commonwealth*, 514 S.W.3d 566 (Ky. App. 2017).

Accordingly, we affirm.

ALL CONCUR.

BRIEFS FOR APPELLANT:

Emily Holt Rhorer
Frankfort, Kentucky

BRIEF FOR APPELLEE:

Daniel Cameron
Attorney General of Kentucky
Frankfort, Kentucky

Todd D. Ferguson
Assistant Attorney General
Frankfort, Kentucky